LOUIS B. MASIN, PLAINTIFF, v. NATIONAL BOX & LUMBER COMPANY, INC., A CORPORATION, ET ALS., DEFENDANTS.

LOUIS B. MASIN, PLAINTIFF, v. SYLVIA GRAY, ET ALS., DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided January 21, 1952.

*Messrs. Greene & Hellring*, attorneys for plaintiff.

*Messrs. Ruback, Albach & Weisman*, attorneys for defendants. National Box & Lumber Company, Inc., *et al.*

*Messrs. Toolan, Haney & Romond*, attorneys for defendant, Isadore Eisenstein.

*Messrs. Osborne, Cornish & Scheck*, attorneys for Josephine Masin.

*Messrs. Potter & Fisher*, attorneys for Mrs. Charles Lefkowitz and Sylvia Gray, individually and as trustee and as executrix.

*Mr. George Furst*, attorney for receiver.

STEIN, J. S. C. An appeal having been taken from an order appointing receiver for the National Box & Lumber Company, Inc., this memorandum is now prepared.

Charles Lefkowitz, who died on July 24, 1949, left him surviving Fannie Lefkowitz, two daughters, Josephine Masin and Sylvia Gray, and four minor grandchildren—two of each daughter. Josephine Masin is plaintiff's wife.

Some years ago Lefkowitz founded the National Box & Lumber Company, Inc., hereinafter referred to as "National," which is said to have assets of over $400,000. All or most of the business real estate occupied by National belongs to Jefferson Terminal Corporation, another Lefkowitz corporation, hereinafter referred to as "Jefferson." The stockholders of Jefferson are Mrs. Lefkowitz, her two daughters and the plaintiff.

The plaintiff has been connected with National for about 22 years, and since the death of Lefkowitz has been its president. When Sylvia Lefkowitz married Moe Gray, he came into National's business.

Over the years Lefkowitz and his wife had disposed, either by sale or gift, of stockholdings in National to the Masin and Gray families. Each son-in-law became the owner of shares; each daughter received shares and each grandchild received shares.

Even in Lefkowitz' lifetime there was strife, envy and ill-feeling in his family. This became aggravated when Moe Gray died in October, 1948. Lefkowitz wanted National to buy out the Gray stock interests at book value—about $400 a share. A barrier to this was a stockholders' agreement dated June 25, 1941, which provided that if any stockholder wanted to sell his stock, he first had to offer it to the other stockholders, and then to the corporation, at par—$100 per share. According to the proofs, the plaintiff was willing to cancel the stockholders' agreement if a satisfactory sale could be worked out, but his wife, Josephine Masin, refused. He testified that he was told by counsel, who acted in the matter, that Mrs. Gray had originally signed a cancellation

of the stockholders' agreement but later revoked her act. The question whether or not there was a cancellation of the 1941 stockholders' agreement and if so, the circumstances and conditions surrounding it, is an issue which will have to be decided on final hearing. One thing is clear: There was no sale of the stock to the corporation.

The strife in the family became more intensified after Lefkowitz' death in July, 1949. The plaintiff and his wife were then already separated. (It has been stated that a matrimonial action is now pending in the Matrimonial Division of this court.) In an effort to maintain some harmony in the family so that the business of National would not suffer, the stockholders appointed Isadore Eisenstein as voting trustee for six months. Mrs. Masin and Mrs. Gray extended this voting trust for five years, but the plaintiff refused to join in. The dissension continued with the result that on July 7, 1950, the stockholders adopted a resolution providing for the liquidation of the business and appointing Eisenstein as liquidating trustee. He undertook the trust. Shortly thereafter, Eisenstein was elected executive vice-president of both Jefferson and National and he also became a director of both. Eisenstein apparently made no effort to liquidate the business in accordance with the stockholders' resolution.

With Eisenstein's entry into the businesses of these companies, the troubles of this family deepened. Eisenstein has been convicted of the crime of false swearing and sentenced to pay a fine of $1,000 and to stand committed until the fine is paid. He has also been convicted, with others, of a conspiracy to bribe public officials of the City of Newark and sentenced to a term of between two and three years in State Prison. That case is on appeal. The proofs thus far show that Eisenstein has misappropriated about $20,000 from Jefferson. For some of these misappropriations he has been indicted by the Essex County grand jury and is awaiting trial. The criminal nature of these abstractions is indicated by the

devious methods used by him. A few instances will be described:

Joseph Clevenger submitted a bill to Jefferson for plumbing work in the amount of $1,320. This bill was altered and raised to $2,320. A check in that amount was drawn to his order. Eisenstein endorsed Clevenger's name on the check and cashed it and sent Clevenger his personal check for $1,320, retaining the $1,000 difference.

Rufus Sullivan submitted a bill to National Lumber Company for $395. This bill was altered by substituting the name of Jefferson in the place of National Lumber Company, and the bill was raised to $1,395. Check for $1,395 was drawn to the order of Sullivan. Eisenstein endorsed Sullivan's name, cashed the check and sent Sullivan his personal check for $395, thus pocketing the difference.

John A. Linnett and Murray Goodzeit appraised certain real estate for the Moe Gray Estate in connection with the settlement of inheritance taxes. At Eisenstein's request, each of them submitted a bill to Jefferson for $2,250. Checks in these amounts were drawn to Linnett and Goodzeit, respectively, their names were then endorsed by Eisenstein, and the checks were cashed by him. When they demanded their money Eisenstein gave them checks of $600 each drawn on the National and charged them to the account of Sylvia Gray.

Alfonso Pagano, a laborer, had done some work for Jefferson about 10 or 12 years before, on a time basis. At the end of the week he would make out a bill for his time. When the job was finished, he left some blank billheads with the company. Eisenstein found these blank billheads and filled out one of them for $591.90 and another for $374.25, drew checks in these amounts to the order of Pagano, endorsed Pagano's name thereon and cashed them. Pagano testified that he did not receive any part of this money. There were about a dozen other similar misappropriations. In addition, Eisenstein withdrew $10,000 by checks to his own order. It also appears that other money in large amounts were

drawn out of Jefferson by some of its stockholders for their own purposes.

On February 28, 1951, Mrs. Masin wrote a letter to J. H. Cohn and Company, the accountants of the company, in which she requested that her account be charged with $7,561.50. This letter itemizes some of the very checks which Eisenstein fraudulently endorsed and cashed.

It also appears that Eisenstein, while acting as voting trustee, liquidating trustee, and vice-president and director of National, sought to acquire stock control of the company with the aid of Mrs. Masin. In the summer of 1951 an offer was submitted in the name of Mrs. Masin to buy the 370 shares in National owned by the Gray family, at $250 per share. On application of Mrs. Gray as executrix of her husband's estate and as trustee for her infant children, this court approved the offer. Neither Mr. Masin nor his infant children were given notice of the proceeding. In his answering affidavit filed in this cause, Eisenstein admits that he was the real or ultimate purchaser of this stock and agreed to finance the deal. That information had not been disclosed to the court. That sale was confirmed by this court on July 3, 1951. In September, 1951, Eisenstein "fired" the plaintiff and admittedly took steps to exclude him from the business and deprive him of his prerogatives and duties as president of the company, and called a meeting of the acting directors to elect new officers for the apparent purpose of ousting plaintiff as president.

On October 3, 1951, the plaintiff filed two actions in this court which will be referred to as the "Jefferson" and "National" suits. The third count of the Jefferson complaint sought an accounting against Eisenstein and the other directors of the company for the money misappropriated and withdrawn by them. In that action, the court entered an order to show cause returnable October 11, 1951, containing a temporary restraining order against further improper withdrawals. In the National case the plaintiff sought to remove Eisenstein as liquidating trustee and to appoint a

receiver in his place because: (1) Eisenstein's. criminal convictions and indictments had brought him into public disrepute, scandal and contempt, and his connection with National reflected unfavorably upon the reputation of the company and the honesty of its management; (2) if Eisenstein's. conviction in the bribery case is affirmed, he will be required to begin his prison sentence and will not be able to carry out his trust; (3) Eisenstein's open hostility and antagonism to the plaintiff disqualified him from acting as trustee; (4) Eisenstein claimed a large sum of money for his services despite the fact that he undertook said trust without pay, which claim will have to be resisted; and that if he continues to operate the company he will be in the position where he can pay himself without any effective control by the stockholders. By a counterclaim later filed in the cause Eisenstein claims $50,000 for such alleged services.

The complaint also charged that the proposed meeting of the directors called for October 8, 1951, was illegal because there was no duly constituted board in that two of its members were not *bona fide* stockholders of the company, and that Eisenstein's action in "firing" plaintiff was an usurpation of power and an attempt to seize control of the corporation and squeeze out plaintiff.

Upon the filing of that suit, this court appointed a custodial receiver, temporarily restrained the directors' meeting called for October 8, 1951, and directed the defendants to show cause on October 11, 1951, why a receiver *pendente lite* should not be appointed and an interlocutory injunction granted, in accordance with the prayer of the complaint.

On October 11, 1951, both orders to show cause were heard together, and two days of hearings were held during which the plaintiff was examined at length on the allegations of his complaint in the National case, and extensive testimony and proofs were offered establishing Eisenstein's misappropriations. At this point it was already evident that the business of National could not be safely left in the hands of Eisen-

stein and that the court would have to appoint a receiver *pendente lite*.

On October 26, 1951, the adjourned date, there was filed with the court, by counsel who appeared for the defendants, a consent to the appointment of a receiver in the form of a notice addressed to and served upon the plaintiff which stated, *inter alia*, that "the undersigned will appear before the Superior Court, Chancery Division * * * and join in the application of the plaintiff for the appointment of a liquidating trustee or receiver of the defendant, National Box & Lumber Company, Inc., and for the immediate liquidation of said company under the direction and supervision of the Court * * *." This notice was signed by Messrs. Ruback, Albach & Weisman as attorneys for National, and Bilder, Bilder & Kaufman, as attorneys for Mrs. Masin and the defendants, Frank M. Edwards, Charles Schneider and Sylvia Gray. Attached to this notice was an affidavit of Charles Schneider, secretary of the company, annexing copies of Eisenstein's resignations as an officer and director of National and as voting trustee. It was also represented that Eisenstein had resigned as liquidating trustee.

At the request of the court, each side submitted a draft of order appointing a receiver, and both sides were afforded a full opportunity to criticize each other's drafts. Counsel for the defendants submitted an order for the appointment of a liquidating "trustee" instead of a "receiver," although as appears from the notice of motion they joined in the prayer for the appointment of a "receiver" or "trustee." The principal difference between the two orders was that the defendants did not want the receiver to continue the operation of the business beyond November 30, 1951, without a special order of the court. In the meantime, they wanted the receiver or trustee to obtain bids for the sale of the business as a going concern and to report his success by November 30, 1951.

The plaintiff submitted an order appointing a receiver to administer the trust and liquidate it under the supervision of the court without tying down the receiver to any time

limit, but giving the receiver and all parties in interest the right to apply for instructions at any time. In support of his draft the plaintiff's counsel urged that the issue as to the applicability of the 1941 stockholders' agreement to the Gray stock sale had to be determined before a sale, in order that the parties might know how to bid at the sale; that Eisenstein had removed or destroyed a lease from Jefferson to National covering the premises occupied by the latter, and that it was necessary to establish the existence of that lease before there could be a sale of the business as a going concern; that a fire loss sustained by National had to be adjusted before a sale; and that the rights, equities and liabilities of Jefferson and National with respect to certain buildings being erected on Jefferson's lands had to be investigated and determined before there could be any sale of the business as a going concern.

There was some delay in entering the order due to substitution of counsel. On the adjourned date, November 14, 1951, Mr. Emanuel P. Scheck appeared for Mrs. Masin and also spoke for Mr. John E. Toolan who, he represented, had been retained by Mr. Eisenstein. Mr. Maurice Potter appeared for the Gray interests. The form of the order was again discussed and the problems facing the receiver were reviewed; and while the defendants urged a liquidation with dispatch, they conceded that there should not be any hasty liquidation, and that the court and the receiver should be fully informed as to all important matters before a sale was had. Thus, in the final analysis, the difference between the drafts of the orders submitted by the parties boiled down to a matter of language, and the court itself rewrote the order, adopting in the main the form submitted by the plaintiff but adding thereto two clauses embodying the views of the defendants reading as follows:

"FURTHER ORDERED, that the said receiver solicit and receive offers or bids for the purchase of the business of National Box & Lumber Company, Inc., as a going concern and entertain and consider any and all plans for the liquidation of National Box & Lumber

Company, Inc., as a going concern, or the reorganization of the business of National Box & Lumber Company, Inc.; and it is

FURTHER ORDERED, that the receiver be and he is hereby directed to perform the duties imposed upon him with all reasonable dispatch; * * *."

The order drafted by the court, in the opinion of the court, gave the defendants all that they were entitled to, in the light of all the circumstances of the case.

■ As the facts unfolded, it became increasingly clear that common questions of fact and law were involved in both cases and that a consolidation was desirable both from the standpoint of the convenience of the court as well as to avoid delay and expense to the litigants, and also to expedite the administration of the receivership. *Rule* 3:42–1. The disappearance or destruction of a lease presents a serious obstacle to an immediate liquidation. Under present conditions it is not likely that this business can be sold as a going concern, at its highest value, without a lease. It has been the practice of the two companies to carry a blanket fire insurance policy covering their interests as they may appear. After a fire which occurred Mr. Eisenstein authorized the erection of one or several buildings on the lands of Jefferson. The contractor has petitioned this court for payment of the cost of construction. The question whether National, the tenant, or Jefferson, the landlord, should pay for these buildings, is important in view of the disappearance of the lease and the open hostility between members of the family, and Jefferson's refusal to recognize the existence of a lease. The fact that several National checks were given by Eisenstein to Linnett and Goodzeit apparently to cover up his peculations in Jefferson raises the suspicion that other similar payments may have been made out of the funds of National. The business offices of both companies are in the same building; the bookkeeper of Jefferson is the bookkeeper of National; Eisenstein was vice-president of both Jefferson and National, and there were interlocking stockholders. In these circumstances the court concluded

that a consolidation of the two causes would serve the best interests of the court and the parties and would expedite the winding up of the receivership. The order of consolidation does not prejudice any rights of the litigants for it specifically provides that the receiver appointed for National has no rights or duties over the assets of Jefferson.